**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**METRO SERVICE GROUP, INC.**                    **CIVIL ACTION**

**VERSUS**                                              **CASE NO. 21-1136**

**WASTE CONNECTIONS BAYOU, INC.**           **SECTION: "G"**

**ORDER AND REASONS**

In this litigation, Plaintiff Metro Service Group, Inc. ("Plaintiff") brings claims against Defendant Waste Connections Bayou, Inc. ("Defendant") arising out of an alleged contract between the parties.[1] Before the Court is Defendant's "Rule 50(b) Motion for Judgment as a Matter of Law or, in the Alternative, Rule 59(a) Motion for New Trial."[2] Plaintiff opposes the motion.[3] For the reasons discussed in detail below, the weight of the evidence supports the jury's verdict. Accordingly, having considered the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court denies the motion.

**I. Background**

On June 13, 2022, this matter proceeded to trial before a jury.[4] The trial lasted for three days.[5] After retiring to deliberate, the jury returned a verdict in favor of Plaintiff on June 15, 2022.[6]

---

[1] Rec. Doc. 1-2 at 5–6.

[2] Rec. Doc. 124.

[3] Rec Doc. 130.

[4] Rec. Doc. 88.

[5] Rec. Docs. 88, 89, 90.

[6] Rec. Doc. 92.

1

Specifically, the jury found that Plaintiff was entitled to $1,677,944 in damages.[7] Based upon a stipulation made by the parties due to a mathematical error, the Court reduced the verdict to $1,396,664.93 and entered judgment for Plaintiff in that amount.[8]

On July 13, 2022, Defendant filed the instant "Rule 50(b) Motion for Judgment as a Matter of Law or, in the Alternative, Rule 59(a) Motion for New Trial."[9] On August 5, 2022, with leave of Court, Plaintiff opposed the motion.[10] On August 15, 2022, with leave of Court, Defendant filed a reply.[11]

The remainder of this Order addresses various contracts involved in this dispute. At trial, the parties referred to these contracts by different names. For clarity, the Court defines them as follows. The Court refers to Defendant's first contract with Jefferson Parish, for which Plaintiff was a subcontractor, as the "2009 Prime Contract."[12] The Court refers to Plaintiff's subcontract with Defendant for the 2009 Prime Contract as the "2009 Subcontract."[13] The Court refers to Defendant's more recent contract with Jefferson Parish as the "2014 Prime Contract."[14]

---

[7] Rec. Doc. 92.

[8] Rec. Doc. 94.

[9] Rec. Doc. 124.

[10] Rec. Docs. 126, 130.

[11] Rec. Docs. 128, 132.

[12] This contract is referenced in Plaintiff's Exhibit 1 as the "Residential Garbage Collection Contract." *See* Plaintiff's Exhibit 1.

[13] Plaintiff's Exhibit 1.

[14] Plaintiff's Exhibit 3.

## II. Parties' Arguments

### A.    *Defendant's Arguments in Support of the Motion*

Defendant argues that the Court should grant judgment as a matter of law for Defendant because the evidence at trial was not sufficient to support the jury's verdict.[15] Defendant argues that there was no actionable contract because "[a] putative agreement to provide an unspecified amount of services fails for lack of a determinable object."[16] Defendant further argues that the evidence at trial shows at most an "agreement that the parties should someday in the future enter into a new written contract."[17]

Defendant argues that there was no evidence at trial that the parties agreed to increase the rate per haul from $165 to $225.[18] Defendant highlights the trial testimony of Plaintiff's CEO, Jimmie Woods, who testified that "I don't think we ever obviously came to an agreement on that number."[19] Defendant further highlights Jimmie Woods' testimony that "we came up with that number" because Plaintiff thought it was a fair market rate.[20] Defendant notes Glenn Woods' testimony that Plaintiff assumed it would get a rate adjustment if Defendant was awarded the new contract.[21] Defendant contends that at best, the evidence at trial demonstrated only that any new contract would be based on "current terms and conditions," and under the terms in place at that

---

[15] Rec. Doc. 124-1 at 5.

[16] *Id.* at 7.

[17] *Id.*

[18] *Id.* at 9.

[19] *Id.* (quoting Rec. Doc. 121 at 259).

[20] *Id.*

[21] *Id.*

time Plaintiff was only to receive $165 per haul.[22] Defendant also highlights the testimony of Barry Bordelon whom when asked whether he made a commitment to Plaintiff that it would receive a rate increase, responded "[t]hat's way beyond my purview."[23] Defendant contends that Tom Martyn testified that Defendant only intended for the parties to keep doing the same work for the same rates, and that nobody proposed or approved a rate increase.[24] Defendant further argues that any alleged agreement to pay $225 is undermined by the fact that Plaintiff continued to do the work for Defendant while charging the original rate for four and a half years.[25] Thus, Defendant argues that there was not sufficient evidence for the jury to conclude that Defendant agreed to the $225 rate.[26]

Defendant further argues that the jury's verdict awarding future damages through 2023 was not supported by the evidence.[27] Defendant contends that Plaintiff presented no evidence that Defendant committed to retain Plaintiff's services "for any definite time period, much less through 2023."[28] Defendant contends that the email suggesting Defendant intended to continue the "current relationship" establishes at most an intention to pay for services at the previously specified rate of $165 plus CPI increases, for work actually performed by Plaintiff.[29] Defendant contends that because the 2009 Subcontract did not "promise any duration or volume of work after the expiration

---

[22] *Id.* at 10.

[23] *Id.* at 11 (quoting Rec. Doc. 122 at 96).

[24] *Id*.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 12.

[28] *Id*.

[29] *Id.*

of Defendant's agreement with the Parish," any extension of this relationship "could not be the basis of an expectation by Plaintiff of work through December 31, 2023."[30] Defendant contends that "[t]o the extent that the Jury awarded damages for time periods after Plaintiff stopped hauling waste, it had no sufficient evidentiary basis to do so."[31]

Alternatively, Defendant argues that the Court should grant a new trial under Rule 59 because the weight of the evidence does not support the verdict.[32] For the same reasons described above, Defendant contends that the weight of the evidence suggests that there was only an agreement to pay $165 per haul for services actually rendered.[33] Defendant again highlights Jimmie Woods' testimony that "I don't think we ever obviously came to an agreement" on the $165 number.[34] Defendant also highlights that Plaintiff continued to do the work for $165 per haul until 2020, which according to Defendant indicates that even Plaintiff understood $165 to be the proper rate.[35] Thus, Defendant contends that the jury's verdict awarding $225 per haul for the entire period between 2013 and 2023 was contrary to the weight of the evidence.[36]

Defendant further argues that the weight of the evidence suggests that $165 was a fair market price for the work performed.[37] Although Plaintiff put on evidence of a St. John Parish contract as evidence of a fair market value, Defendant contends that it showed at trial that "[t]he

---

[30] *Id.* at 12–13.

[31] *Id.* at 13.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.* at 14.

different scope of work covered by the two contracts explains the difference in rates."[38]

In addition, Defendant argues that the weight of the evidence does not support Plaintiff's future damages model.[39] Defendant contends that "[b]oth the President and the CEO for Plaintiff confirmed that Defendant was never obligated to direct any volume of hauls to Plaintiff, and that there was no term guarantee,"[40] and thus "any putative contract after 2013 lacked a determinable object as to the damages claimed for work beyond 2020."[41] Defendant contends that the email stating that "current terms and conditions will continue with our new agreement" is insufficient to extend Plaintiff's damages through the 2024 because "that email reflected only internal discussions by Defendant, and was never sent to Plaintiff."[42] Furthermore, Defendant argues that "[w]ithout a specified volume of work under an enforceable agreement between the parties," Plaintiff's damages model calculating how many loads Plaintiff would have hauled through 2024 is speculative.[43]

Lastly, Defendant contends that "if the Court finds a lack of evidence as to just one of the categories of damages sought by Plaintiff, federal law requires a new trial be granted."[44] Defendant argues that when the verdict constitutes a "general verdict," any verdict in favor of the plaintiff can be upheld "only 'if each of the several theories is sustained by the evidence and legally sound'" because with a general verdict "it is impossible to tell which of [the multiple] theories of liability

---

[38] *Id.*

[39] *Id.* at 15.

[40] *Id.*

[41] *Id.* at 15–16.

[42] *Id.*

[43] *Id.*

[44] *Id.* at 16.

was adopted by the jury."[45] Therefore, Defendant contends that a new trial is warranted if the Court finds that there was not sufficient evidence that (1) a contract existed after 2013; (2) Plaintiff was entitled to CPI increases; (3) Defendant agreed to pay greater than $165; or (4) *quantum meruit* warranted a rate higher than $165.[46]

## B.   *Plaintiff's Opposition to the Motion*

In opposition, Plaintiff argues that the verdict was supported by the evidence. Plaintiff argues that there was testimony from multiple witnesses corroborating the parties' oral agreement.[47] Plaintiff contends that both Jimmie Woods and Glenn Woods testified that they had a contract extending the terms of the 2009 Subcontract to the 2014 Prime contract.[48] Plaintiff argues that testimony from Defendant's employees confirmed this relationship.[49] Plaintiff points to the testimony of Darin Scott Bordelon ("Gus Bordelon"), who testified that it was his understanding that Plaintiff would be the subcontractor for the 2014 Prime Contract unless terminated.[50] Plaintiff also points to Gus Bordelon's testimony that he believed Defendant was conveying to Jimmie Woods that the written agreement would be provided.[51] Plaintiff argues that the jury considered evidence showing Defendant's "continual, repeated, explicit, verbal and written confirmations that the terms and conditions with metro would continue under the new 2014

---

[45] *Id.* at 16–17 (quoting *Nowell by & Through Nowell v. Universal Elec. Co.*, 792 F. 2d 1310, 1312 (5th Cir. 1986)).

[46] *Id*. at 7.

[47] Rec. Doc. 130.

[48] *Id.* at 7.

[49] *Id.*

[50] *Id.* (citing Rec. Doc. 122 at 13).

[51] *Id*. (citing Rec. Doc. 122 at 26–27).

Prime Contract," and that those terms "included all the terms of the 2009 Subcontract agreement along with a per haul rate increase to $225."[52] Plaintiff also notes that the jury heard evidence that Defendant represented that Plaintiff was their subcontractor under the 2014 Prime Contract.[53]

Plaintiff further argues that Louisiana law does not require a contract to establish a price or volume.[54] Rather, Plaintiff argues that where a contract does not establish the price, "a contractor is owed the reasonable value of its services."[55]

## C.   *Defendant's Arguments in Further Support of the Motion*

Defendant again argues that there was no evidence that the parties agreed to any rate other than $165 per haul.[56] Defendant contends that all of the evidence that Plaintiff pointed to regarding the $225 rate was from Plaintiff, but that proof of an oral contract requires corroboration from a source other than the plaintiff.[57]

Defendant argues that Plaintiff's contention that the jury could supply "a reasonable price" of $225 is incorrect.[58] In response to Plaintiff's citation to *Bordelon v. Comeaux Furniture & Appliance, Inc.*, Defendant argues that the case is inapposite because it applies only where the parties' agreement does not include a price term.[59] Unlike in *Bordelon* where the price term was

---

[52] *Id.*

[53] *Id.* at 8.

[54] *Id.* at 10.

[55] *Id.*

[56] Rec. Doc. 132 at 2.

[57] *Id.*

[58] *Id.* at 3.

[59] *Id.* (citing *Bordelon v. Comeaux Appliance, Inc.*, 97-2864 (La. 2/13/98); 705 So. 2d 740, 741).

missing, Defendant argues that the 2009 Subcontract included a rate of $165 per haul.[60] Therefore, Defendant argues that there was no basis for the jury to supply a $225 rate.[61] Defendant argues that the fact that the parties discussed the possibility of a rate increase was merely a negotiation, and did not modify the current rate of $165 per haul.[62]

Defendant further argues that there was no evidence at trial to support the jury's verdict finding damages through 2023 because there was no evidence that the parties agreed to a definite time period.[63] Defendant argues that even assuming that the 2009 Subcontract terms apply, the 2009 Subcontract did not provide a set duration.[64] Rather, because the 2009 Subcontract provided that it would expire upon the termination of the 2009 Prime Contract, which was terminated on January 1, 2014, Defendant contends that applying the terms of the 2009 Subcontract would mean that any oral agreement would have terminated on January 1, 2014 as well.[65] Defendant argues that the duration of the alleged oral agreement cannot be tied to the length of the 2014 Prime Contract because "the 2009 Subcontract makes no reference to the 2014 Prime Contract" and there was no evidence at trial that the parties agreed to a contract through 2023.[66] Defendant contends that under Louisiana law, a contract is terminable at will if its duration is indeterminate or ambiguous.[67] Because "the parties did not consent to a specific duration for any alleged oral

---

[60] *Id.*

[61] *Id.* at 5.

[62] *Id.*

[63] *Id.* at 6.

[64] *Id.*

[65] *Id.* at 7.

[66] *Id.*

[67] *Id.*

contract governing their post-2013 relationship, and such a duration is not discernable even if the

terms of the 2009 Subcontract are deemed to apply," Defendant contends that any agreement

between the parties was terminable at will.[68]

### III. Legal Standard

#### A.    *Judgment as a Matter of Law Under Federal Rule of Civil Procedure 50(b)*[69]

Federal Rule of Civil Procedure 50(a) governs motions for judgment as a matter of law.

Under Rule 50(a)(1):

> If a party has been fully heard on an issue during a jury trial and the court finds that
> a reasonable jury would not have a legally sufficient evidentiary basis to find for
> the party on the issue, the court may:
>
> > (A) resolve the issue against the party; and
> > (B) grant a motion for judgment as a matter of law against the party on a
> > claim or defense that, under the controlling law, can be maintained or
> > defeated only with a favorable finding on that issue.

Motions under Rule 50(a)(1) may be renewed after trial pursuant to Rule 50(b), which states:

> If the court does not grant a motion as a matter of law under Rule 50(a), the court
> is considered to have submitted the action to the jury subject to the court's later
> deciding the legal questions raised by the motion. No later than 28 days after the

---

[68] *Id.* at 8.

[69] The parties briefing relies on Federal Rule of Civil Procedure 50(b) (governing motions for judgment as a matter of law) and Federal Rule of Civil Procedure Rule 59 (governing motions for a new trial). However, the Fifth Circuit has held that the Supreme Court's decision in *Gasperini v. Center for Humanities* requires that Courts apply the law of the forum state in ruling on motions for judgment as a matter of law and motions for a new trial when the Court is exercising diversity jurisdiction.[69] Nevertheless, the Louisiana law standards for judgment notwithstanding the verdict are largely similar to the federal standards. *Compare Bellows v. Amoco Oil Co.*, 118 F.3d 268, 273 (5th Cir. 1997) ("A motion for judgment as a matter of law should be granted by the trial court if, after considering all the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion, the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict.") *with Joseph v. Broussard Rice Mill, Inc.*, 2000-0628, p. 4 (La. 10/30/00); 772 So. 2d 94, 99 ("[A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict."). The Louisiana law standard for a new trial is also largely similar to the federal standard. *Compare Joseph v. Broussard Rice Mill, Inc.*, No. 2000-0628 (La. 10/30/00); 772 So. 2d 94 (providing for a new trial "[w]hen the verdict or judgment appears clearly contrary to the law and the evidence") *with Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (recognizing a district court's authority to grant a new trial "on the basis of the court's firm belief that the verdict is clearly contrary to the weight of the evidence.").

entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the motion, the court may:

> (1) allow judgment on the verdict, if the jury returned a verdict;
> (2) order a new trial; or
> (3) direct the entry of judgment as a matter of law.

The Fifth Circuit has emphasized that "the two basic purposes of this rule are to enable the trial court to re-examine the question of evidentiary sufficiency as a matter of law if the jury returns a verdict contrary to the movant, and to alert the opposing party to the insufficiency before the case is submitted to the jury."[70]

A motion pursuant to Rule 50(b) "in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict."[71] Therefore, under Rule 50(b), "judgment as a matter of law is proper after a party has been fully heard by the jury on a given issue, and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue."[72] In evaluating a Rule 50(b) motion, a court must "consider all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party."[73] Because all reasonable inferences and credibility determinations should be resolved in favor of the non-movant in a Rule 50(b) motion, "judgment as a matter of law should not be granted unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary

---

[70] *Scottish Heritable Tr., PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 610 (5th Cir. 1996) (internal citation and quotation marks omitted).

[71] *Flowers v. S. Reg'l Phys. Servs., Inc.*, 247 F.3d 229, 235 (5th Cir. 2001) (quoting *Ford v. Cimarron Ins. Co.*, 230 F.3d 828, 830 (5th Cir. 2000)).

[72] *Id.* (internal citation and quotation marks omitted).

[73] *Id.* (internal citation and quotation marks omitted).

conclusion."[74]

**B.      New Trial Under Federal Rule of Civil Procedure 59**

Federal Rule of Civil Procedure 59 governs motions for a new trial brought within twenty-

eight days after the entry of judgment.[75] Rule 59(a) provides:

> The court may, on motion, grant a new trial on all or some of the issues—and to
> any party—as follows:
>      (A) after a jury trial, for any reason for which a new trial has heretofore been
>      granted in an action at law in federal court; or
>      (B) after a nonjury trial, for any reason for which a rehearing has heretofore
>      been granted in a suit in equity in federal court.

A renewed motion for judgment as a matter of law may be joined in the alternative with a motion

for new trial under Rule 59, but the motions have distinct functions and are governed by different

standards. "The trial court's power to grant a new trial [under Rule 59(a)] on the basis of the court's

firm belief that the verdict is clearly contrary to the weight of the evidence has . . . long been

regarded as an integral part of trial by jury."[76] "In making this determination, the district court

weighs all the evidence, but need not view it in the light most favorable to the nonmoving party."[77]

The Fifth Circuit has instructed that district courts should "respect the jury's collective wisdom

and must not simply substitute its opinion for the jury's," but "if the trial judge is not satisfied with

the verdict of a jury, [s]he has the right—and indeed the duty—to set the verdict aside and order a

new trial."[78]

---

[74] *Id.* (internal citation and quotation marks omitted).

[75] Fed. R. Civ. P. 59.

[76] *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

[77] *Id.*

[78] *Id.* (internal quotations omitted).

## IV. Analysis

Defendant moves for judgment as a matter of law, or alternatively a new trial, on the basis that there was not sufficient evidence for the jury's verdict.[79] Specifically, Defendant argues that there was not sufficient evidence: (1) that the parties agreed to continue the terms of the 2009 Subcontract through 2023; (2) that the parties agreed to the $225 per haul rate; and (3) that Plaintiff was entitled to future damages through 2023. The Court addresses each of these arguments in turn.

**A.**   ***Whether the Parties Agreed to Continue the Terms of the 2009 Subcontract Through 2023***

"A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished."[80] "[O]ffer and acceptance [of a contract] may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent."[81] Although "[t]he object of a contract must be determined at least as to its kind," "[t]he quantity of a contractual object may be undetermined, provided it is determinable."[82] Where a contract is not reduced to writing but its value is in excess of five hundred dollars, "the contract must be proved by at least one witness and other corroborating circumstances."[83] "The 'other corroborating circumstances' need only be general in nature; independent proof of every detail of the agreement

---

[79] Defendant argues in passing that "[a] putative agreement to provide an unspecified amount of services fails for lack of determinable object" Rec. Doc. 124-1 at 7, and thus suggests that the contract fails because Defendant did not guarantee a specific number of hauls. Rec. Doc. 124-1 at 15. Defendant does little to develop this argument, and provides no authority for this proposition. The Court notes that it rejected an identical argument in its May 17, 2022 Order and Reasons denying Defendant's motion for summary judgment. Rec. Doc. 51 at 17–19.

[80] La. Civ. Code art. 1906.

[81] La. Civ. Code art. 1927.

[82] La. Civ. Code art. 1973.

[83] La. Civ. Code art. 1846.

is not required."[84] However, the corroborating circumstances must come from a source other than the plaintiff.[85]

To begin, the Court must determine whether there was sufficient evidence for a reasonable jury to conclude that there was an oral contract for Plaintiff to be the subcontractor for the life of Defendant's 2014 Prime Contract with Jefferson Parish. The trial record in this case contains more than enough evidence upon which a reasonable jury could have concluded that the parties had an oral agreement in which Plaintiff would be the subcontractor for the life of Defendant's 2014 Prime Contract with Jefferson Parish. The 2009 Subcontract between the parties provided that the subcontract would remain in place until the expiration or termination of Defendant's contract with Jefferson Parish, unless otherwise terminated earlier.[86] Plaintiff's theory of the case before the jury was that the parties made an oral agreement to incorporate the terms of the 2009 Subcontract into a new subcontract related to Defendant's 2014 Prime Contract with Jefferson Parish. At trial, Plaintiff's President Glenn Woods testified as follows:

> Q: I want to ask, what was Metro's understanding regarding their subcontract and the relationship with Waste Connections moving into the new 2014 prime contract with the Parish of Jefferson?
>
> A: All indications we got, the guys said, "Let's move forward with these" – "with this new ten-year contract with what's in place, you know, except for the rate change."
>
> Q: Mr. Woods, why did Metro believe they were going to continue as a subcontractor for the David Drive drop site under the 2014 -- the new 2014 prime contract?

---

[84] *Suire v. Lafayette City-Parish Consol. Gov't*, No. 2004-1459 (La. 4/12/05); 907 So. 2d 37, 58.

[85] *See, e.g., Hodson v. Daron Cavaness Builder, Inc.*, 17-1235 (La. App. 1 Cir. 2/27/18); 243 So. 3d 597, 600.

[86] Plaintiff's Exhibit 1 ("The term of this agreement . . . shall commence on the Effective Date and shall terminate upon the expiration or termination of the Contract, unless otherwise terminated pursuant to this Agreement."); *Id.* (defining the "Contract" as the "Residential Garbage Collection Contract" between Defendant and Jefferson Parish).

> A: We were told we would, you know, with all the correspondence and communications we had with Waste Connections reps, you know, saying, 'Let's move forward as a team. Let's get this thing done."[87]

Jimmie Woods also testified that he "had three dozen conversations with Waste Connections officials relative to memorializing the commitment in writing"[88] and that he "got verbal commitments that the team was going to stay intact and that we would get a subcontract done."[89]

The jury heard evidence corroborating Plaintiff's understanding of the parties' agreement. For example, Gus Bordelon testified that he was "integral" to helping Defendant get the 2014 Prime Contract,[90] and that it was his understanding that Plaintiff would be the subcontractor on the 2014 Prime Contract unless terminated.[91] The jury was also presented with an email from Thomas Martyn to Jimmie Woods[92] stating as follows:

> As you know, we are hoping to renew our collection agreement with Jefferson Parish. I am writing to confirm that if we are successful, we will continue our current relationship. We would like to know that we can count on your continued partnership going forward. I think our people have worked well together in providing service in that we all can be proud.[93]

Jimmie Woods testified that he understood this statement to mean that "if the Parish would award

---

[87] Rec. Doc. 121 at 121.

[88] *Id.* at 231.

[89] *Id.* at 232.

[90] Rec. Doc. 122 at 12.

[91] *Id.* at 13. The parties' 2009 Subcontract included a provision requiring that Defendant provide written notice and an opportunity to cure any deficiencies in performance prior to terminating Plaintiff. *See* Plaintiff's Exhibit 1 at 1. Additionally, the parties stipulated before trial that Defendant "never formally terminated the contract" and "never provided [Plaintiff] a notice of termination." Rec. Doc. 86 at 5.

[92] The parties' briefing and exhibits have spelled Mr. Woods' first name both as "Jimmie" and "Jimmy." The memorandum will refer to him as "Jimmie Woods" unless quoting an exhibit that uses the other spelling.

[93] Plaintiff's Exhibit 2.

this team an extension, another ten years, a noncompetitive offering, that the team would stay intact."[94] Additionally, the jury was presented an email from Thomas Martyn to Barry Bordelon in which Martyn states:

> FYI. I personally told jimmy in his suite after [a] Saints game congrats on the NOLA contract, and that we would continue in JP. I just don't want to jinx it by putting in writing that we will continue with him. When we get our new contract, we will use him. As soon as it's done, I'll give him a letter[.][95]

When asked about this statement at trial, Martyn testified as follows:

> What I was talking about "I don't want to jinx it" is our new ten-year agreement going through by making the assumption that it's done and it's going to be approved.
>
> . . .
>
> I wanted to wait until it was approved so that we could get him a contract in writing. I don't have -- I can't give him a contract for a contract that I don't have. Hopefully, that makes sense.[96]

Despite the evidence that Martyn did not "want to jinx it," Martyn testified that by that point, Defendant had already listed Plaintiff as its subcontractor in its representations to Jefferson Parish in order to get the 2014 Prime Contract.[97] Additionally, the jury heard the following exchange from Gus Bordelon's testimony:[98]

> Q: Okay. Now, moving into the 2014 prime contract, Mr. Woods also made clear that he wanted a new written subcontract agreement; correct?
>
> A: Correct.

---

[94] Rec. Doc. 121 at 243.

[95] *Id.* at 240; Plaintiff's Exhibit 13.

[96] Rec. Doc. 122 at 141.

[97] *Id.* at 140; *see also* Plaintiff's Exhibit 20 (Defendant's affidavit to Jefferson Parish listing "Metro Disposal" as a subcontractor); Rec. Doc. 121 at 280 (Jimmie Woods' testimony that "[We]re still – our affidavit is still a part of their submittal to the Parish in terms of payment, even to this day. But obviously, we're not participating in that, but it's still represented as if we are to the Parish government.").

[98] Rec. Doc. 122 at 26–27.

Q: And you recall that?

A: I do.

Q: Do you recall that he made many requests for a written contract?

A: Yes.

Q: Do you recall Waste Connections continually telling him, "Don't worry about it. We'll get to that"?[99]

…

A: Yes.[100]

Given the evidence cited above, a reasonable jury could have concluded that the parties agreed to a new subcontract for the life of the 2014 Prime Contract. Defendant objects that its statements that it would "continue [the] current relationship" with Plaintiff meant only that it would continue to pay $165 per load of trash actually hauled, and not that Plaintiff would be the subcontractor through 2023. However, in addition to Thomas Martyn's emails cited above in which he states that Defendant "will continue" with Plaintiff and that they would "continue [the] current relationship," the jury saw a third email from Martyn containing a similar statement.[101] Barry Bordelon emailed Thomas Martyn explaining that Jimmie Woods was requesting a written

---

[99] Following an objection, Plaintiff's counsel rephrased the question to ask "Was it your view at the time that what Waste Connections was telling Mr. Woods would make him think he was going to get a the written subcontract agreement?" Rec. Doc. 122 at 26–27.

[100] *Id.*

[101] Plaintiff's Exhibit 12. Defendant has argued that this email "reflected only internal discussions by Defendant, and was never sent to Plaintiff," and therefore "it cannot carry any weight of an agreement to direct any work to Plaintiff for any term." Rec. Doc. 124-1 at 16. This argument fails for several reasons. First, it is not at all clear that the email reflected "only internal discussions." Although this statement was in an email from Martyn to Barry Bordelon, it was in response to Barry Bordelon's inquiry as to how he may respond to Jimmie Woods. *See* Plaintiff's Exhibit 12. Second, as highlighted above, the jury saw evidence of other instances where it was communicated to Plaintiff that the parties' relationship would continue under the new contract. Mostly notably, as discussed, the jury saw an email from Martyn stating that he "personally told jimmy in his suit after a saints game congrats on his Nola contract and that we would continue in JP." Plaintiff's Exhibit 13.

17

commitment, and asked Martyn "[h]ow may I respond?"[102] Martyn responded "[c]urrent terms and conditions will continue with our new agreement."[103] When asked about this email at trial, Martyn denied that he meant that his reference to "current terms and conditions" meant the terms listed in the 2009 Subcontract, and instead that he was merely referencing "doing the same work for the same rates."[104] However, this testimony was impeached with Martyn's deposition testimony where he admitted that he was referring to the terms "included in the then-existing subcontractor agreement" between the parties.[105] In addition, Martyn admitted on the stand that the requirement that Plaintiff maintain insurance still applied even though the parties did not have a written agreement requiring insurance.[106]

The evidence described above corroborates Plaintiff's representatives' testimony that the parties had an oral agreement to apply the terms of the 2009 Subcontract to a new subcontract under Defendant's 2014 Prime Contract with Jefferson Parish. As discussed above, that subcontract provided that the terms of the subcontract would last until the expiration or termination of the contract between Defendant and Jefferson Parish unless otherwise terminated.[107] Therefore, drawing all reasonable inferences in Plaintiff's favor, the Court cannot say that "the facts and inferences point so strongly and overwhelmingly" in Defendant's favor such that reasonable jurors could not have found that the parties agreed to a new subcontract for the life of the 2014 Prime

---

[102] Plaintiff's Exhibit 12.

[103] *Id.*

[104] Rec. Doc. 122 at 128.

[105] *Id.* at 130–31. To be sure, Martyn disavowed this deposition testimony at trial and attempted to justify his contradictory testimony by referencing back to his answer when asked a similar question earlier in the deposition. However, Martyn's credibility as a witness was within the province of the jury to assess.

[106] Rec. Doc. 122 at 134.

[107] Plaintiff's Exhibit 1.

Contract. Additionally, because the parties stipulated that the 2009 Subcontract provided that Plaintiff was to receive CPI increases and that Defendant never provided them,[108] the same evidence supports the jury's verdict reflecting CPI payments through 2023.

In reply, Defendant argues that even assuming that the parties agreed to adopt the terms of the 2009 Subcontract, that contract did not include a definite duration, or alternatively the duration term is ambiguous, and thus under Louisiana law the contract was terminable at will.[109] Louisiana Civil Code article 2024 provides that "[a] contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party."[110] Even assuming that Defendant gave reasonable notice of termination, which there is no evidence to support, the 2009 Subcontract was not "[a] contract of unspecified duration." As discussed above, the 2009 Subcontract provided that "[t]he term of this agreement . . . shall commence on the Effective Date and shall terminate upon the expiration or termination of the Contract, unless otherwise terminated pursuant to this Agreement.[111] Additionally, the 2009 Subcontract defined the "Contract" as the "Residential Garbage Collection Contract" between Defendant and Jefferson Parish. Thus, the subcontract specified that it was to endure until the contract between Defendant and Jefferson Parish ended, or was otherwise terminated for a reason permitted under the subcontract.[112] Louisiana courts have found that "contracts whose terms are fixed with reference to the happening of a future event are of specified duration and Article 2024 is inapplicable."[113]

---

[108] Rec. Doc. 86 at 4.

[109] Rec. Doc. 132 at 7–8.

[110] La. Civ. Code art. 2024.

[111] Plaintiff's Exhibit 1.

[112] *Id.* (permitting termination of the agreement for cause or due to bankruptcy).

[113] *Caddo Gas Gathering L.L.C. v. Regency Intrastate Gas LLC*, No. 44,851 (La. App. 2 Cir. 11/12/09); 26

Thus, Article 2024 does not render the 2009 Subcontract, nor the parties' oral contract adopting its terms, terminable at will.

Plaintiff relies on *Smith v. Applied Concepts, Inc*. in support of its argument.[114] In that case, the Louisiana First Circuit Court of Appeal concluded that a contract was of an unspecified duration where the contract provided that it could be terminated: (1) upon the mutual agreement of the plaintiff and the founder of the defendant Applied Concepts, Inc., Mr. Max Smith; (2) upon the death of Max Smith; or (3) if the defendant WestTenn, Inc. or Max Smith violated any of the conditions of the agreement.[115] The court explained that "the provisions regarding termination address **how** the agreement is terminated, not **when**."[116] As to the provision regarding Max Smith's death, the court cited *Jones v. Crescent City Health and Racquetball Club* for the proposition that "lifetime contracts are treated as contracts for an indefinite term, terminable at will b[y] either party upon giving reasonable notice."[117] However, the *Jones* court assumed that all contracts for life are terminable at will because lifetime employment contracts were barred by statute.[118] Therefore, the fact that a lifetime employment contract may be terminable at will does not detract from the Court's analysis above that a contract's duration may be fixed by reference to a certain

---

So. 3d 233, 236 (finding that a provision that a contract would remain in effect for a term "coextensive with the ownership or use" of a gas pipeline was not a contract of unspecified duration such that Article 2024 did not apply); *Schultz v. Hill*, No. 2002-0835 (La. App. 1 Cir. 2/14/03); 840 So. 2d 641, 644 (reasoning that comment c to Article 2024 "indicate[s] that by 'unspecified' duration, it is meant 'indefinite' duration.").

[114] No. 2008-2138 (La. App. 1 Cir. 6/17/09); 2009 WL 2486885.

[115] *Id.* at *3.

[116] *Id.* (emphasis in original).

[117] 489 So. 2d 381, 384 (La. App. 5 Cir. 1986).

[118] *See State ex rel. Guste v. Orkin Exterminating Co., Inc*., 528 So. 2d 198, 201 (La. App. 4 Cir. 1988) (finding *Jones* distinguishable because "lifetime contracts for *employment* . . .. are not enforced as definite contracts by legislative act" and concluding that there "is no legal basis for [Defendant's] assertion that lifetime contracts are indefinite") (emphasis added).

future event. Because here, the 2009 Subcontract was to terminate at the expiration or termination of the contract between Defendant and Jefferson Parish, it was not terminable at will under Civil Code article 2024.[119]

## B. Whether the Parties Agreed to a Rate of $225 Per Load

Next, the Court must determine whether a reasonable jury could have found that the parties agreed to the $225 per load. Defendant claims that Plaintiff's position that it should have been paid $225 is inconsistent with its position that the terms of the 2009 Subcontract were incorporated into the parties agreement regarding the 2014 Prime Contract.[120] Defendant argues that if the evidence is sufficient to establish that the parties planned to continue the terms of the 2009 Subcontract, "then the price of $165, which was a current term, should also have continued."[121] However, Defendant provides no reason why the parties could not have agreed to incorporate the old terms but include a price adjustment to $225 per haul. Both Jimmie and Glenn Woods testified that the rate adjustment was how Plaintiff was supposed to benefit from the new 2014 Prime Contract.[122]

---

[119] The reply also appears to argue that the alleged oral contract to continue the terms of the 2009 Subcontract could not have bound Defendant to the subcontract for the life of the 2014 Prime Contract because the 2009 Subcontract makes no reference to the 2014 Prime Contract. In other words, Defendant argues that because the 2009 Subcontract stated that it would expire upon the expiration or termination of the 2009 Prime Contract, which terminated on January 1, 2014 when the 2014 Prime Contract began, the terms of the 2009 Subcontract would require that any new agreement incorporating its terms would terminate on January 1, 2014. Rec. Doc. 132 at 6–7. However, Defendant concedes that "was not the parties' intent, as they were discussing services to be performed in 2014 and beyond." *Id.* Rather, as discussed above, there was sufficient evidence at trial for the jury to conclude that the parties agreed to incorporate the terms of the 2009 Subcontract into a subcontract agreement tied to Defendant's 2014 Prime Contract with Jefferson Parish. Thus, it was reasonable for the jury to conclude that the parties agreed that Plaintiff would be the subcontractor for the length of the 2014 Prime Contract, which is set to expire at the end of 2023. *See* Plaintiff's Exhibit 3 at 11; *see also* Rec. Doc. 122 at 253–61 (parties stipulating that the 2014 Prime Contract contained a typographical error where the ending date of the contract states December 31, 2024 rather than 2023).

[120] Rec. Doc. 124-1 at 10 n. 25.

[121] *Id.*

[122] Rec. Doc. 121 at 200, 250–51.

Of course, to uphold the jury's verdict the trial record still must contain sufficient evidence that the parties agreed to the $225 price.

Glenn Woods testified at trial that it was his understanding that if Defendant received the 2014 Prime Contract with Jefferson Parish, "the team will stay intact, but there would be a rate increase for [Plaintiff]."[123] He explained that "everyone was supposed to benefit from the new contract as far as rate adjustments as it relates to the new contract,"[124] and that Plaintiff's new rate would be $225 per load hauled, which was "[t]he current market rate at that time."[125] Jimmie Woods similarly testified as follows regarding how he expected Plaintiff to benefit from Defendant's new contract with Jefferson Parish:

> Again, it was a very unique opportunity to get a ten-year commitment from Jefferson Parish. A lot of hard work went into it. I credit Barry Bordelon for doing a lot of the work, of course. But it was a very unusual situation. We were able to get a ten-year commitment without it going -- without opening it up for public competition. That took a lot of work, a lot of convincing of officials to get that done. The benefit of that was, one, you have another ten-year potential revenue stream where you can provide those services to the Parish; and, two, with the enhanced services as well as negotiating a better price, it was a better opportunity for all of the partners. So Waste Connections got a better number, Ramelli got a better number, as well as additional houses to collect, and Metro was supposed to get an increase per unit number that we never received.[126]

Jimmie Woods testified that the rate adjustment was Plaintiff's "way of sharing in the profits that we all worked to put in place for another ten years."[127] However, Jimmie Woods also testified as follows:

Q: Mr. Woods, who from Waste Connections did you discuss Metro's rate increase

---

[123] *Id.* at 200.

[124] *Id.*

[125] *Id.* at 201.

[126] *Id.* at 251.

[127] *Id.* at 253.

with? What personnel from Waste Connections did you have discussions with?

A:  Again, Waste Connections was almost like a revolving door, but constant communication was with Barry Bordelon, at some point Gus Bordelon. I had conversations with Tom Martyn about it as well. I don't think we ever obviously came to an agreement on that number, but we discussed it.

Q: And what response -- if you can recall, what response did you get from those personnel members when you proposed or presented this number?

A: I mean, obviously, it was a reasonable number of the similar services, and the market was -- folks were getting paid more than that particular number. So it was a very good number as it relates to market standards.[128]

Therefore, although Jimmie Woods testified that he discussed the increase with Defendant's representatives, he stated at trial that he did not think they came to an agreement. Additionally, Tom Martyn testified as follows:

Q. Okay. And it's also a stipulated fact in this case that Mr. Jimmie Woods and Glenn Woods both understood they would get an increased rate with the new contract. You would dispute that; correct?

A. They never got it from me.

 Q. Okay. People -- other witnesses have testified that they raised, "Look, we need a new rate." Did you ever tell Mr. Woods there's not going to be a new rate?

A. No, I never told him there would be a new rate. I never told him there would be a different rate.[129]

On cross examination, Martyn further testified that he never spoke with any representative of Plaintiff about an increased rate of $225.[130] However, as finder of fact, the jury was tasked with deciding whether to credit Martyn's testimony. Given that the jury heard testimony that Martyn

---

[128] *Id.* at 258–59.

[129] Rec. Doc. 122 at 148.

[130] *Id.* at 150.

was currently employed by Defendant,[131] as well as the evidence that Defendant failed to provide

Plaintiff with a written contract despite Plaintiff's numerous requests, the Court is bound to assume

that the jury did not find Martyn's testimony credible.

Jimmie Woods' testimony that he did not think the parties came to an agreement on $225

does not necessarily mean that no reasonable jury could have concluded that the parties did. When

asked about the $225 figure, Jimmie Woods testified as follows:

> Having not received any -- we hadn't received any adjustments since 2009
> inception of the first iteration of the contract. Obviously, we had to make an
> adjustment to that because it was -- it just wasn't very profitable. So we needed to
> make that adjustment. We talked about that with [Defendant] to ensure that moving
> forward in the second iteration that we were able to increase that number.[132]

Glenn Woods testified that "we repeatedly asked for the rate increase in the contract."[133] In

addition, Gus Bordelon testified as follows when asked about the $225 rate:[134]

> Q: Okay. Tell me where the e-mail is in all this information where it was relayed to
> them, we're still negotiating price?
>
> A: I don't know.
>
> Q: Did you relay it?
>
> A: I did not.
>
> Q: But you were okay bringing them along with you; right? You brought them into
> that contract?
>
> A: I brought them, yes.
>
> Q: And you're sitting here today saying that they didn't have that new rate because

---

[131] *Id.* at 102.

[132] Rec. Doc. 121 at 255.

[133] *Id.* at 220.

[134] Rec. Doc. 122 at 71–72.

you didn't think it was fair, but you never told them; right?[135]

…

Q: So you didn't tell him, we're not doing that price; is that true?

A: Did I tell him that?

Q: Yes.

A: I did not.

Q: Did anyone tell him?

A: Not that I know of.

. . .

Q: You've already testified no one told him no; correct?

A: No one told him no.

Q: Okay. And you moved forward with that relationship; right?

A: Yeah.[136]

Given Jimmie Woods' testimony that Plaintiff communicated to Defendant that it needed a rate adjustment for the new subcontract, Glenn Woods' testimony that they repeatedly asked for the rate increase, and Defendant's repeated assurances that the parties' relationship would continue and that a contract was coming, the Court could find that **"the facts and inferences [do not] point so strongly and overwhelmingly"** in Defendant's favor that reasonable jurors could not conclude that Defendant agreed to the $225 price. The Court instructed the jury as follows:

> A contract is formed by the consent of the parties established through offer and acceptance. Offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent. However, where there is no meeting of the minds, there is no contract because of lack of

---

[135] *Id.* at 71.

[136] *Id.* at 72.

consent.[137]

Therefore, despite Jimmie Woods' statement that he didn't think they came to an agreement on the $225 price, the jury may well have believed that by continuing its work with Plaintiff and repeatedly assuring that the agreement would be memorialized in writing indicated that Defendant was consenting to Plaintiff's demand for $225 per haul. To be sure, the jury was also presented with evidence that Plaintiff did not begin to charge Defendant at the $225 rate until November of 2018.[138] Nevertheless, a motion for judgment as a matter of law must be denied unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion."[139] Drawing all reasonable inferences and credibility in Plaintiff's favor, the Court cannot say that the evidence presented was insufficient.

Plaintiff also argues that Louisiana law does not require that the parties agree on a price term in order to form an enforceable contract and that a party may instead be owed the reasonable value of its services where there is no agreement as to price.[140] Defendant responds that Louisiana law allows this only where the parties' agreement does not provide for the price term. In *Bordelon v. Comeaux Furniture and Appliance, Inc.*,[141] the Louisiana Supreme Court explained that it has "recognized that the fact the amount of compensation a party is to receive for his services was not agreed upon does not vitiate the contract. Instead, the law will imply in the contract a provision

---

[137] Rec. Doc. 123 at 36. *See* La Civ. Code art. 1927.

[138] Rec. Doc. 121 at 212.

[139] *Flowers*, 247 F.3d at 235.

[140] Rec. Doc. 130 at 9–10.

[141] No. 97-2864 (La. 2/13/98); 705 So. 2d 740 (1998).

that the party 'would be paid a reasonable sum for his services.'"[142] Both *Bordelon* and the case it relies upon involve circumstances where the contract is silent as to compensation. Here, however, the written terms of the 2009 Subcontract provided for compensation at a rate of $165 per haul. In the absence of any agreed upon modification of that price term, the Louisiana Supreme Court's decision in *Bordelon* does not provide authority for the Court to imply a different price into the parties' contract.[143] However, as discussed above, there was sufficient evidence for the jury to determine that Defendant agreed to Plaintiff's demand for $225 per haul.

Alternatively, Defendant asks the Court to grant a new trial because, according to Defendant, the weight of the evidence does not support the jury's verdict.[144] On such a motion, the Court "weighs all the evidence, but need not view it in the light most favorable to the nonmoving party."[145] The Fifth Circuit has instructed that district courts should "respect the jury's collective wisdom and must not simply substitute its opinion for the jury's," but "if the trial judge is not satisfied with the verdict of a jury, [s]he has the right—and indeed the duty—to set the verdict

---

[142] Rec. Doc. 124-1 at 13.

[143] Defendant also argues that the evidence at trial regarding a contract in for services in St. John's Parish is not sufficient evidence that $225 was a fair market value for the services Plaintiff was providing. Because *Bordelon* does not provide authority for the Court to simply apply a fair market value for Plaintiff's services, the Court need not address this argument in depth. Nevertheless, the evidence at trial does support that $225 would have been a fair market value. Jimmie Woods testified that Plaintiff used "industry standards," "compared other contracts," and "did our own internal analysis" to determine the $225 was the appropriate rate. Rec. Doc. 121 at 256. Glenn Woods testified that $225 was "the standard market rate." *Id.* at 201. Although there was testimony that the nature of the services in St. John Parish was slightly different, Jimmie Woods' testimony suggests that Plaintiff took those differences into account, as Plaintiff "came in below" the price of the St. John Parish contract. *Id.* at 256. Additionally, as discussed above, there was evidence at trial suggesting that even Defendant considered $225 to be an appropriate rate for this work. *Id.* at 201 (testimony of Glenn Woods that Defendant offered other companies $200 or $225 to haul garbage from the David Drive drop site); Rec. Doc. 122 at 52 (Gus Bordelon testimony that $165 was a fair market rate *in 2009*). Lastly, Defendant did not put on any evidence of the fair market rate for similar services from 2014 on. Therefore, the evidence presented at trial supports that $225 was the fair market value.

[144] Rec. Doc. 124-1 at 13.

[145] *Smith,* 773 F.2d at 613.

aside and order a new trial."[146]

Defendant argues that the weight of the evidence does not support an agreement to pay $225 per load. Even without Rule 50's requirement that the Court view the evidence in the light most favorable to the Plaintiff, the Court finds that the weight of the evidence supported the jury's verdict. In addition to the evidence highlighted above, the evidence at trial casts substantial doubt upon the credibility of Defendant's witnesses' testimony. The evidence at trial suggested that Defendant repeatedly reassured Plaintiff that a written contract would be provided, and then attempted to take advantage of the fact that no written agreement existed in order to create profits for itself.[147] Glenn Woods testified for Plaintiff that he received a call from an associate in the business inquiring about Plaintiff's relationship with Defendant because the associate had received a call from Defendant offering to have them pick up trash from the David Drive site for $200 or $225 per haul.[148] To be sure, as discussed above, some of the evidence presented at trial supported Defendant's position that the parties did not agree to a new rate. The jury nevertheless found Defendant liable and assessed damages at the rate of $225 per haul. The Court cannot say that such a finding was not "supportable by any fair interpretation of the evidence."[149]

Next, Defendant argues that the evidence presented at trial regarding another contract (the "St. John Parish contract") was not evidence that $225 was a fair market value for the services

---

[146] *Id.* (internal quotations omitted).

[147] Plaintiff's Exhibit 14 (documenting an email between Defendant's employees suggesting that they should "reel in the subcontract work that is not under contract or not required under contract." Specifically, the employee explains that he "wants to take back" the work that Plaintiff was doing in Jefferson Parrish and St. John Parrish as it "would add $120k per month of net revenue, with $20K-30K of [earnings before income taxes] per month."); *See also* Rec. Doc. 122 at 39–48 (testimony of Gus Bordelon).

[148] Rec. Doc. 121 at 201.

[149] *Broussard Rice Mill, Inc.*, 772 So. 2d at 100.

provided.[150] Defendant highlights that Plaintiff accepted the $165 rate for several years, and that the St. John Parish contract price was higher because that contract involved a lower volume of hauls and a greater distance from the site to the landfill.[151] The Court disagrees that the weight of the evidence does support that $225 was the market rate. To begin, Jimmie Woods' testimony about the St. John Parish contract appears to have taken into account the differences between the St. John Parish contract and the contract at issue here. Jimmie Woods testified that the St. John Parish contract was for $295 per haul, and that Plaintiff "came in below that number."[152] Furthermore, Jimmie Woods testified that Plaintiff "used industry standards," "compared other contracts," and "did [its] own internal analysis" to determine that $225 was the appropriate rate.[153] Glenn Woods testified that $225 was "the standard market rate."[154] Additionally, as discussed above, there was evidence at trial suggesting that even Defendant considered $225 to be an appropriate rate for this work.[155] Furthermore, Gus Bordelon testified that $165 was a fair market rate in 2009.[156] However, Defendant did not put on any evidence of the fair market rate from 2014 on. Thus, the Court cannot say that there was no evidence that $225 was a fair market rate nor that such a conclusion would be against the weight of the evidence.

---

[150] The Court assumes that this argument goes to whether the jury could have found that $225 was the appropriate price in the absence of an agreement by the parties to pay that amount.

[151] Rec. Doc. 122 at 54–55.

[152] Rec. Doc. 121 at 256.

[153] *Id.*

[154] *Id.* at 201.

[155] *Id.* (testimony of Glenn Woods that Defendant offered other companies $200 or $225 to haul garbage from the David Drive drop site).

[156] Rec. Doc. 122 at 52.

### C.     *Whether Plaintiff was Entitled to an Award of Future Damages*

Lastly, Defendant argues that the weight of the evidence does not support the award of future damages.[157] Defendant argues that the award of damages through 2023 was speculative because: (1) there was no agreement that Plaintiff's services would be used through 2023; and (2) there was no guaranteed number of hauls. For the reasons discussed at length above, the evidence presented at trial supports the award of damages through 2023, as the evidence corroborated that Plaintiff was to be the subcontractor for the David Drive drop site for the length of the 2014 Prime Contract with Jefferson Parish. Thus, the Court will turn to Defendant's argument that future damages were speculative because Defendant did not guarantee a volume of hauls.

Louisiana Civil Code article 1995 provides that "[d]amages are measured by the loss sustained by the oblige and the profit of which he has been deprived." Stated differently, "the measure of damages for a breach of contract is the sum that will place plaintiff in the same position as if the obligation had been fulfilled."[158] Damages for lost profits "must be proved with reasonable certainty and will not be allowed where purely conjectural."[159] However, "broad latitude is given in proving lost profits because this item of damages is often difficult to prove and mathematical certainty or precision is not required."[160] The Fifth Circuit has explained that reasonable certainty "merely means that the plaintiff must prove damages by a preponderance of the evidence as in

---

[157] Rec. Doc. 124-1 at 15.

[158] *LAD Servs. of Louisiana, LLC v. Superior Derrick Servs., LLC*, 13-0163 (La. App. 1 Cir. 11/7/14); 167 So. 3d 746, 761.

[159] *A & W Sheet Metal, Inc. v. Berg Mech., Inc.*, 26,799 (La. App. 2 Cir. 4/5/95); 653 So. 2d 158, 163 (citing *Tide Craft, Inc. v. Red Ball Oxygen Co.*, 514 So. 2d 664, 672 (La. App. 2d Cir. 1987).

[160] *Louisiana Farms v. Louisiana Dept. of Wildlife and Fisheries*, 95-845 (La. App. 3 Cir. 10/9/96); 685 So. 2d 1086, 1105 (citing *Fritscher v. Chateau Golf & Country Club*, 453 So. 2d 964 (La. App. 5 Cir. 1984)).

other civil contexts."[161]

At trial, the parties had competing expert witnesses testify about damages in this case. Plaintiff's expert testified that its calculation of damages for future lost profits was based on the monthly average of the number of hauls Plaintiff made between August of 2009 and September of 2020.[162] The jury was shown charts prepared by the parties' experts that purported to calculate the damages owed in this case. During deliberations, the jury submitted a question to the Court asking for copies of the experts' charts, and asking whether they were bound by the numbers contained in them.[163] The parties agreed to provide the charts to the jury, and the Court instructed the jury that they were not bound by the numbers in the charts.[164] Plaintiff's expert's chart was as follows:

| Metro Service Group Estimated Lost Net Profits | | | |
|---|---|---|---|
| | $165 Scenario 1 | $225 Scenario 2 | Exhibit Reference |
| Past Losses | | | |
| 5/1/2018 to   6/16/2022 | $ 524,951 | $ 968,868 | A, B |
| Future Losses | | | |
| 6/17/2022 to  12/31/2024 | $ 556,352 | $ 709,076 | C, D |
| Total | $1,081,303 | $1,677,944 | |

Plaintiff's expert Dennis Tizzard testified that this chart represents two scenarios, one based on the $165 rate and one based on the $225 rate.[165] He also testified that his analysis incorporated the

---

[161] *Mobil Expl. and Producing U.S., Inc. v. Cajun Const. Servs., Inc.*, 45 F.3d 96, 101–02 (5th Cir. 1995).

[162] Rec. Doc. 122 at 188.

[163] Rec. Doc. 90-4 at 1.

[164] *Id.*

[165] Rec. Doc. 122 at 173–74, 183–84.

CPI changes during this time period.[166] In awarding $1,677,944 for Plaintiff, the jury adopted Plaintiff's Expert's "Scenario 2" including future losses through 2024. The parties stipulated at trial that the 2014 Prime Contract had a typographical error indicating that it extended through 2024, rather than 2023. As a result, the parties stipulated that any future damages award should be reduced by one year.[167] When the jury returned a verdict of $1,677,944, the parties stipulated that it should be reduced to $1,396,664.93.[168]

Defendant attempted to undermine Plaintiff's expert's calculation by suggesting that there was a decline in the number of hauls Plaintiff was performing starting in 2018.[169] Defendant also attempted to suggest that Plaintiff could have made up these profits by putting its equipment to use on another opportunity.[170] However, on redirect, Plaintiff's expert explained that these profits would still be lost because Plaintiff could have worked on both opportunities.[171] Defendant nevertheless argues that Plaintiff's expert's calculations are based on speculation, which cannot be the basis for future damages.[172] However, as explained above, lost profits need only be proven by a preponderance of the evidence, and need not be mathematically certain. Thus, the Court finds that the evidence supported the jury's damages award.

---

[166] *Id*. at 177.

[167] Rec. Doc. 122 at 258–61.

[168] Rec. Doc. 123 at 56.

[169] Rec. Doc. 122 at 189–90.

[170] *Id.* at 194–95.

[171] *Id.* at 200–01.

[172] Rec. Doc. 124-1 at 16.

## V. Conclusion

For the foregoing reasons, the Court finds there is sufficient evidence in the record to support the jury's verdict to the extent it found that the parties orally agreed to a new subcontract through 2023 including CPI increases. Accordingly,

**IT IS HEREBY ORDERED** that Defendant's "Rule 50(b) Motion for Judgment as a Matter of Law or, in the Alternative, Rule 59(a) Motion for New Trial"[173] is **DENIED**.

**NEW ORLEANS, LOUISIANA,** this __7th__ day of November, 2022.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[173] Rec. Doc. 124.